**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. 13-00253 (GK)** |
| **RODNEY CLASS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT'S MOTIONS SEEKING MISCELLANEOUS RELIEF**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby files the following response to Defendant Rodney Class's various *pro se* motions seeking miscellaneous relief. The defendant's arguments lack merit and his requests for relief should be denied.

## FACTUAL BACKGROUND

The government expects the evidence at a hearing or trial to show that, on May 30, 2013, at approximately 11:35 a.m., the defendant parked his Jeep Rubicon in a permit-only parking area on the south side of the Capitol near the U.S. Botanic Garden.[1] The defendant got out of the Jeep and walked into House and Senate office buildings where he had paperwork purporting to appoint him a "Private Attorney General" time stamped at the offices of various committees and Members of Congress.

While the defendant was in the Capitol and its office buildings, United States Capitol Police Special Agent Laneeka Manning was on patrol and observed the defendant's Jeep displaying North Carolina license plates parked in the permit-only parking area. Manning approached the vehicle and determined that the Jeep did not have a parking permit displayed on

[1] This area is reserved for employees of the House of Representatives.

the front windshield.  Manning looked through the windows of the Jeep and observed, in plain view, a machete strapped to the roll bar and what appeared to be a holster in the map pocket of the driver's side door.  Manning radioed for additional officers and a bomb dog to come to her location in the parking lot.  After conducting a search for the registered owner of the Jeep, officers obtained the name and a photograph of the defendant.

At approximately 1:30 p.m., the defendant left the Capitol building and walked back to the parking lot.  As the defendant approached the Jeep and the Capitol Police officers, the officers asked the defendant if his name was Rodney Class.  The defendant acknowledged that was his name.  An officer asked the defendant if it was his Jeep and the defendant confirmed that the Jeep belonged to him.  For the safety of the officers, a police officer asked the defendant if he had any weapons on him to which the defendant replied that he did not.  An officer inquired of the defendant whether there were weapons in the vehicle and the defendant confirmed that there were.  The officer asked the defendant if he could check the defendant for weapons and the defendant responded that was fine.  The officer then frisked the defendant and did not discover any weapons.

Roughly contemporaneous with this frisk, the defendant said words to the effect of, "We're on the same team," and said he had a document to prove it.  One of the officers asked the defendant what he meant and the defendant showed the officers a document which the defendant claimed appointed him a law enforcement officer.  When an officer asked the defendant about the document, the defendant said he was on his way to arrest a federal judge in Pennsylvania but, before he could do so, he needed the document to be signed by Members of Congress.

The officers asked the defendant to sit in the back seat of a police car while they continued to conduct their on-scene investigation.  After complying with this request, the

defendant asked the officers if there was a problem and an officer informed the defendant that it is illegal to have weapons on Capitol grounds. In response, the defendant told the officers, *inter alia*, that he is a "Private Attorney General," federal law does not apply to him, the District of Columbia is not a state, federal agents do not have authority to enforce the law in the District of Columbia, and the Capitol Police do not have arrest authority.

Shortly thereafter, the officers took the defendant out of the police car, placed him in handcuffs, and informed him that he was under arrest.[2] During this process, the defendant continued to claim that the officers did not have authority to arrest him. Officers asked the defendant if he would consent to a search of his car and he initially agreed but, once he was given a written consent form and the officers told him they could not make the textual changes he requested, the defendant refused to sign the form. The officers placed the defendant in a police wagon and transported him to the Capitol Police headquarters. They towed the Jeep to the Metropolitan Police Department's impound lot while they applied for, and eventually obtained, a warrant to search the Jeep. During a subsequent search of the Jeep pursuant to the warrant, officers recovered two loaded pistols, a loaded rifle, over 200 rounds of ammunition, 15 knives, and three axes. The guns were found (a) in a holster between the front seats, (b) inside a rifle case behind the front seat, and (c) in a suitcase in the rear of the Jeep.

The defendant was interviewed at Capitol Police headquarters by special agents with the Federal Bureau of Investigation. At the commencement of this interview, the agents reviewed with the defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The defendant acknowledged that he understood his rights and wished to answer questions without an attorney. The defendant memorialized his waiver of these rights by signing a "Waiver" card that contained

---

[2] In addition to the criminal charges for which the defendant was arrested, the Capitol Police officers also issued the defendant a warning for parking in a permitted area.

the rights he was waiving. See Ex. A. During this interview the defendant stated, *inter alia*, that he had parked his car in the parking lot closest to the Southwest side of the Capitol, went inside the Capitol and to office buildings to have his "Commission by Declaration" signed, believes he is a "Constitutional Bounty Hunter" and "Private Attorney General," and plans to enforce Title 18 of the United States Code against federal judges who he believes have broken the law. He further stated that he travels around the country with his guns and other weapons and planned to bring them to eastern Pennsylvania where he planned to bring charges against a federal judge.

## PROCEDURAL BACKGROUND

On May 31, 2013, the defendant was charged by complaint in District of Columbia Superior Court with Carrying a Pistol under D.C. Code § 22-4504(a). After a three-day period of detention under D.C. Code § 22-1322(b), the defendant was released on conditions of release including a stay-away order from the District of Columbia. On September 3, 2013, a grand jury indicted the defendant in the United States District Court for the District of Columbia on two charges: Possession of a Firearm on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(1), and Carrying a Pistol in violation of D.C. Code § 22-4504(a).[3]

Thereafter, from January 3 to March 27, 2014, the defendant, although still represented by counsel, filed thirty-six *pro se* motions [Dkt. Nos. 7, 10-14, 16, 20-22, 23, 25-49]. At a status hearing on February 3, 2014, the government inquired of the Court which motions would require a response. The Court indicated that it wished the government to state its positions on each of the

[3] This Court has construed one of the defendant's motions as contending "that he was not indicted by a properly constituted federal grand jury. See Mem. Op. at 24 [Dkt. No. 76]. The grand jury that indicted the defendant was Grand Jury 12-2 and was sworn in on May 7, 2012. In compliance with Rule 6(f), the foreperson of the grand jury returned the indictment on September 3, 2013 to a United States Magistrate Judge in open court. See Ex. B (certified copy of signed indictment). The defendant has not – and cannot – point to any defect in the grand jury's indictment that would justify its dismissal. See Mem. Op. at 24 ("Defendant has not identified any deficiencies in the grand jury process") [Dkt. No. 76].

defendant's requests for relief, but that memoranda of law on each point were not necessary. The Court also ordered a competency evaluation of the defendant.

On February 7, March 7, and April 4, 2014, the government filed Omnibus Responses to the Defendants' Motions [Dkt. Nos. 17, 24, 51].  On April 7, 2014, the Court held a hearing on the defendants' motions at which the parties presented oral argument.

On April 16, 2014, the Court issued a Memorandum Opinion and Order granting in part, denying in part, and deferring in part the defendant's thirty-six motions [Dkt. No. 76].  In this Opinion, the Court construed the portions of the defendant's motions on which the Court deferred ruling to (a) raise Second Amendment challenges to his prosecution, (b) claim "he was searched and seized without a proper complaint, that he was interrogated for hours without a Miranda warning, and that his seized property was never returned to him," (c) claim he was not indicted by a properly constituted federal grand jury, (d) "challenge the validity of his arrest and the search and seizure of his vehicle under the Fourth Amendment," and (e) assert that his "prosecution in the District of Columbia for conduct allegedly permitted by his North Carolina permit violates the Privileged and immunities Clause of Article IV of the Constitution, the Full Faith and Credit Clause, and the Equal Protection Clause of the Fourteenth Amendment."  See Mem. Op. at 14, 15, 23, 24, 25, 28 (citation and internal quotations omitted) [Dkt. No. 76].  The Court further ordered the Government to "address Defendant's assertion that he was originally arrested on a traffic violation that was subsequently dismissed and that the Capitol Police officers searched his vehicle without a warrant."  See Mem. Op. at 31 [Dkt. No. 76].

## ARGUMENT

### I. DEFENDANT'S CONDUCT IS NOT PROTECTED BY THE SECOND AMENDMENT

Defendant, appearing *pro se*, has moved to dismiss the indictment on various grounds. Specifically, defendant contends that a criminal prosecution arising from the unlawful possession of firearms in this case violates the Second Amendment (Def. Mot. filed 3/26/14 at 6-7; Def. Mot. at 6-7 filed 2/18/14). By Order filed on April 16, 2014, this Court has ordered the United States to respond to defendant's Second Amendment challenge. Accordingly, the United States submits the following points and authorities in opposition to defendant's motions.

#### A. Heller Does Not Support Defendant's Second Amendment Claims

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment confers upon an individual the right to keep and bear arms that is not conditioned on service in a militia. 554 U.S. at 595. At the "core" of the Second Amendment is the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635 (holding that a District of Columbia ordinance, which created an "absolute prohibition of handguns held and used for self-defense in the home," could not withstand any level of "scrutiny that [the Court] has applied to enumerated Constitutional rights").

In Heller, the Supreme Court held that the Second Amendment protects an individual's right to keep and bear arms, which includes the right to possess firearms in the home, and the right to have those firearms in a condition "operable for the purpose of immediate self-defense."

Heller, 554 U.S. at 573-636.[4] The respondent in Heller was a special police officer in the District of Columbia, who applied to register a handgun that he wished to keep in his home. Id. at 575-576. Relying on statutes that generally prohibit the possession of handguns in the District, the District refused to grant Heller a registration certificate. Id. Heller then filed a civil suit on Second Amendment grounds. Id. Heller sought to enjoin the District from enforcing (1) the District's bar on the registration of handguns; (2) the licensing requirement for firearms, insofar as it prohibits the carrying of a firearm in the home without a license; and (3) the "trigger-lock requirement," which requires that a lawfully owned firearm be kept "unloaded and dissembled or bound by a trigger lock or similar device" if the firearm is kept in the home. Id.

The Supreme Court held that the Second Amendment does not permit "the absolute prohibition of handguns held and used for self-defense in the home." Heller, 554 U.S. at 636. The District's ban on handguns was deemed unconstitutional to the extent that it prohibits "an entire class of arms that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]," and extends that prohibition to the home, "where the need for defense of self, family, and property is most acute." Id. at 627-28. The "District's requirement . . . that firearms in the home be rendered and kept inoperable at all times" was also found to violate the Second Amendment. Id. at 630. The Court specifically declined to address Heller's challenge to the District's licensing requirement, because the Court presumed that its holding with respect to the registration requirement would enable Heller to secure a license to carry a firearm in his home. Id. at 630-31.

Although Heller held that the relevant provisions were unconstitutional as applied in the context of banning handguns that are possessed in the home and in the context of prohibiting the

[4] Heller overruled prior contrary case law in this jurisdiction. See Sandidge v. United States, 520 A.2d 1057, 1058-59 (D.C. 1987).

rendering of firearms inoperable for the purpose of self-defense, Heller did not wholly invalidate the registration and licensing scheme. Indeed, the Court's remedy for the Second Amendment violation presumed that the District's basic framework for registering and licensing firearms would remain in place – the Court held that the District "must permit [Heller] to register his handgun and must issue him a license to carry it in the home." Heller, 554 U.S. at 635.

Moreover, the Court specifically noted that the right secured by the Second Amendment is "not unlimited." Heller, 554 U.S. at 626. The Court acknowledged, for example, that prohibitions on carrying concealed weapons have been deemed lawful under the Second Amendment. Id. The Court also emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-627. And the Court specifically noted that those "presumptively lawful regulatory measures" were just examples, and that the list provided was not "exhaustive." Id. at 627 n.26. In addition, the Court limited the sorts of weapons protected by the Second Amendment to those "in common use," id. at 627, and noted that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," id. at 625.

Again in McDonald v. Chicago, 120 S. Ct. 3020 (2010), the Supreme Court emphasized that Heller "recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" Id. (quoting Heller, 554 U.S. at 626). McDonald further noted that its "holding did not cast doubt on [] longstanding regulatory measures," including "laws imposing conditions and qualifications on the commercial sale of arms." Id. (quoting Heller, 554 U.S. at 626-627).

Following the Supreme Court's decision in Heller, the District of Columbia revised its firearms regulations,[5] and those regulations were again challenged on appeal. In Heller v. District of Columbia (Heller II), 670 F.3d 1244 (D.C. Cir. 2011), the Court of Appeals for the District of Columbia Circuit addressed the framework within which to evaluate Second Amendment challenges:

> Under Heller, therefore, there are certain types of firearms regulations that do not govern conduct within the scope of the Amendment. We accordingly adopt, as have other circuits, a two-step approach to determining the constitutionality of the District's gun laws. Ezell v. City of Chicago, 651 F.3d 684, 701–04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010). We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny. See Ezell, 651 F.3d at 701–04; Chester, 628 F.3d at 680; Reese, 627 F.3d at 800–01; Marzzarella, 614 F.3d at 89; see also Nordyke v. King, 644 F.3d 776, 786 (9th Cir. 2011) ("only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment").

[5] In response to the Supreme Court's decision in Heller, the District of Columbia enacted a series of emergency amendments to its firearms statutes, including the "Firearms Control Amendment Act of 2008," D.C. Act 17-422 (July 16, 2008), 55 DCR 8237; the "Second Firearms Control Amendment Act of 2008," D.C. Act 17-502 (Sept. 16, 2008), 55 DCR 9904; the "Second Firearms Control Congressional Review Emergency Amendment Act of 2008," D.C. Act 17-601 (Dec. 12, 2008), 56 DCR 9; and the "Firearms Registration Emergency Amendment Act of 2008," D.C. Act 17-651 (January 6, 2009), 56 DCR 911. The emergency amendments became permanent in D.C. Law 17-372 (effective March 31, 2009), 56 DCR 1365. Under these statutory amendments, the District of Columbia, *inter alia*, provided a self-defense exemption for temporary possession of a firearm registered to another person within the registrant's home, and provided for the registration of pistols for use in self-defense within the home. See D.C. Code § 7-2502.03 (registration procedures). The District of Columbia also amended its regulations in order to implement those new statutory provisions. See 24 D.C. Mun. Reg. § 2300.3 (allowing discharge of "a registered firearm while it is being used to protect against a reasonably perceived threat of immediate harm to a person in the registrant's home"); 24 D.C. Mun. Reg. § 2320 (establishing "Procedures and Requirements for Registration of a Pistol for the Purpose of Self-Defense Within the Applicant's Home").

Applying this analysis, the D.C. Circuit concluded that "basic registration of handguns is deeply enough rooted in our history to support the presumption that a registration requirement is constitutional." 670 F.3d at 1252-53.  The Circuit then remanded for further consideration of some of the District's more unique registration requirements, such as firearms testing and fingerprinting, under intermediate constitutional scrutiny.  Id.

Similarly, state courts have long recognized that the existence of an individual right to keep and bear arms does not preclude appropriately drawn licensing and registration requirements. See, e.g., Davis v. State, 146 So. 2d 892, 893-894 (Fla. 1962) (upholding law prohibiting unlicensed carrying of pistol or repeating rifle; law "was designed to protect the people . . . from the bearing of weapons by the unskilled, the irresponsible, and the lawless"); Strickland v. State, 72 S.E. 260, 260-265 (Ga. 1911) (upholding law prohibiting carrying pistol without license); State v. Mendoza, 920 P.2d 357, 359-368 (Hawaii 1996) (upholding law prohibiting possession of firearm without permit; law permissibly intended to ensure that "only those who are mature, law abiding, competent persons possess firearms"); Matthews v. State, 148 N.E.2d 334, 337-338 (Ind. 1958) (upholding law prohibiting unlicensed carrying of pistol outside abode or place of business); People v. McFadden, 188 N.W.2d 141, 143-144 (Mich. Ct. App. 1971) (upholding law prohibiting unlicensed carrying of pistol concealed on person or in vehicle); Mosher v. City of Dayton, 358 N.E.2d 540, 542-543 (Ohio 1976) (upholding ordinance requiring that person wishing to possess handgun first obtain handgun identification card); State v. Tully, 89 P.2d 517, 517-518 (Wash. 1939) (upholding law prohibiting unlicensed carrying of pistol concealed on person or in vehicle). Thus, to the extent that the defendant is arguing that the Second Amendment precludes regulation of the possession and carrying of firearms, that claim fails.

**B.      These Criminal Statutes May Be Lawfully Applied to the Defendant's Conduct**

This Court need not – and should not – decide any broad constitutional claims buried within the defendant's pleadings here. Whatever problems there may be with these particular regulatory regimes, this defendant may not invoke the Second Amendment's protections.  Put differently, even if, under other circumstances, the Second Amendment would protect a citizen's right to carry a gun outside the home for purposes of lawful self-defense without a registration or license, the defendant here cannot avail himself of those legal protections. The prospect of other, potentially invalid applications of these firearms provisions does not assist this defendant.

Even assuming, *arguendo*, that a statute is unconstitutional in one respect, the statute is not necessarily void in all respects.  See, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 699-700 (1995); United States v. Salerno, 481 U.S. 739, 745 (1987); Schall v. Martin, 467 U.S. 253, 268 n.18 (1984) ("More fundamentally, this sort of attack on a criminal statute must be made on a case-by-case basis.  The Court will not sift through the entire class to determine whether the statute was constitutionally applied in each case. And, outside the limited First Amendment context, a criminal statute may not be attacked as overbroad.") (citations omitted).  In fact, over a hundred years ago, a court in this jurisdiction rejected the theory now espoused by the defendant as "not reasonable" and contrary to Supreme Court precedent.  Chapman v. United States, 5 App. D.C. 122, 1895 WL 11796, *6 (D.C. Cir. 1895) (Where a statute by its terms might "apply to objects forbidden by the Constitution[,] . . . the statute will be allowed its full force and operation, as applicable to all cases, rightfully and

constitutionally within its provisions, but such application will be restrained as to those objects simply to which the statute is forbidden to extend.") (citing cases).[6]

This defendant may not invoke the Second Amendment to protect any alleged right to carry a concealed weapon in a sensitive area, on government property, such as the grounds of the United States Capitol.   Restricting the possession of firearms in "sensitive places" is presumptively lawful under the Second Amendment.  See Heller, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. . .").  See also United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011) (although not deciding whether a national park qualified as a "sensitive place" under Heller, the Fourth Circuit rejected Second Amendment challenge to defendant's conviction for possessing a loaded handgun in a national park, pursuant to 36 C.F.R. § 2.4(b), given that "the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks"); United States v. Dorosan, 350 Fed. Appx. 874 (5th Cir. 2009) (upholding validity of regulation prohibiting guns on U.S. Postal Service property); DiGiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d

---

[6]  See also, e.g., Ayotte v. Planned Parenthood, 546 U.S. 320, 328-29 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.  . . . [W]e try not to nullify more of a legislature's work than is necessary, for we know that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.  It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another. Accordingly, the normal rule is that partial, rather than facial, invalidation is the required course, such that a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact.") (citations and internal quotations omitted); United States v. Booker, 543 U.S. 220, 258-59 (2005) (invalidating Sentencing Reform Act only in part; although certain provisions of Sentencing Reform Act violate Sixth Amendment, those parts can be severed from other parts of Act; "And we must refrain from invalidating more of the statute than is necessary.  Indeed, we must retain those portions of the Act that are (1) constitutionally valid; (2) capable of functioning independently; and (3) consistent with Congress' basic objectives in enacting the statute.") (citations and internal quotations omitted).

365 (Va. 2011) (upholding regulations banning possession of firearms on public university's property). Furthermore, the defendant here does not allege that he carried the weapon for lawful self-defense. Because the defendant does not contend that he carried the weapon for lawful self-defensive purposes, he may not avail himself of the Second Amendment right that was recognized by the Supreme Court in Heller.[7]

Moreover, a "conviction for carrying a concealed pistol without a license on the streets of the District of Columbia [does] not violate [the] constitutional right to keep and bear arms." Gamble v. United States, 30 A.2d 161, 164 (D.C. 2011). Indeed, "more than a century ago, the Supreme Court commented that 'the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons[.]'" Id. (quoting Robertson v. Baldwin, 165 U.S. 275, 281-282 (1897) (dictum)); see also Peterson v. Martinez, 707 F.3d 1197, 1212 (10th Cir. 2013) (declining to address broader constitutional questions and rejecting defendant's claims on the ground that the concealed carrying of firearms falls outside the scope of the Second Amendment's guarantee).

### C. The Defendant May Not Invoke the Equal Protection Clause or Privileges and Immunities Clause to Escape Criminal Prosecution Here.

The defendant cannot show that enforcement of these firearms provisions against him would run afoul of the Equal Protection Clause or the Privileges and Immunities Clause.

---

[7] Nor could the defendant justify his decision to carry a gun on the streets of the District of Columbia as a matter of anticipatory self-defense. See Mack v. United States, 6 A.3d 1224, 1229 (D.C. 2010) (Mack "asks [the Court] to recognize a right to carry a dangerous weapon on the streets of the District of Columbia as a precautionary measure, in anticipation of the need to use it in self-defense. We have never recognized such a sweeping exemption from the statute's prohibition. Indeed, doing so now would be inconsistent with prior, binding authority.") (internal footnote and citations omitted); Hurt v. United States, 337 A.2d 215, 217 (D.C.1975) (self-defense doctrine "is inapplicable where one anticipating harm carries a pistol in public for a period of time before the actual danger arises").

Every individual – whether a District resident or a non-resident – would be subject to prosecution under the facts and circumstances of this case.  Put differently, the defendant cannot show that his Second Amendment rights have been treated with any less respect than the purported Second Amendment rights of the residents of the District of Columbia. Accordingly, the enforcement of these provisions in this case does not implicate the defendant's rights under the Equal Protection Clause.  See City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 440 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.").

Defendant's effort to invoke the Privileges and Immunities Clause fares no better.  "The privileges and immunities clause of article IV, section 2, serves to establish a 'norm of comity … that is to prevail among the States with respect to their treatment of each other's residents.'" Hicklin v. Orbeck, 437 U.S. 518, 523-524 (1978) (citation omitted).  Given Congress's plenary power to enact legislation pertaining to the District of Columbia, it is far from clear that the Privileges and Immunities Clause would apply to the District of Columbia's firearms regulations. See Banner v. United States, 428 F.3d 303, 308 (D.C. Cir. 2005) (citing Neild v. District of Columbia, 110 F.2d 246, 249 n. 3 (D.C. Cir.1940) (Privileges and Immunities Clause is "a limitation upon the states only and in no way affects the powers of Congress over the District of Columbia")).  Even assuming, *arguendo*, that the Privileges and Immunities Clause does apply to the firearms regulations at issue, the District of Columbia's firearms regulations do not violate any rule of comity because these regulations apply to all persons within the District of Columbia's territorial jurisdiction, regardless of his or her state of residence.  See, e.g., Teare v. Committee on Admissions, 566 A.2d 23, 29-30 (D.C. 1989) (requirement that applicants to the

District of Columbia Bar who seek admission without examination graduate from an ABA accredited law school does not violate the Privileges and Immunities Clause because "[i]t applies equally to D.C. residents and non-D.C. residents alike").

The defendant suggests that the fact that he (allegedly) serves as a "Private Attorney General and a 14th Amendment Bounty Hunter" in North Carolina somehow vests him with a Second Amendment right to carry a weapon in the District without following the District of Columbia's procedures (Def. Mot. filed 3/26/14 at 10).  However, the North Carolina law does not divest the District of Columbia of its ability to enact and enforce its own criminal laws within its own territorial jurisdiction. See generally 21 Am. Jur. 2d. Criminal Law § 435 (2009) ("a state's criminal law has no force and effect beyond its territorial limits").  Subject to the exception of D.C. Code § 7-2502.01, the District of Columbia requires persons in possession of a firearm to obtain a registration. The defendant did not have (and does not assert that he ever attempted to obtain) a registration to possess a firearm in the District of Columbia.  Therefore, he remains subject to prosecution for his conduct in this jurisdiction without regard to whether he could lawfully possess a weapon in North Carolina.

Indeed, the District of Columbia Court of Appeals has rejected an analogous claim in Hargrove v. United States, 55 A.3d 852, 856 n.7 (D.C. 2012).  There, a retired police officer argued that his firearms conviction could not survive scrutiny under the Second Amendment because he registered the weapon in Maryland, where he then resided.  Id. at 856.  Although the Court did not need to reach the issue (as it was raised for the first time on appeal), the Court nonetheless found that Hargroves's argument "has no merit in any event, certainly when analyzed for unpreserved plain error."  Id. at n.7.  Significantly, the Court cited with approval a number of cases from other jurisdictions rejecting residency-based challenges to gun-registration

requirements. Id. (citing Osterweil v. Bartlett, 819 F. Supp. 2d 72, 90 (N.D.N.Y. 2011) (upholding, against equal protection and right-to-travel challenges, New York state law requiring residency to obtain permit to possess and carry firearm); Peterson v. LaCabe, 783 F. Supp. 2d 1167, 1170 (D. Colo. 2011) (same, as to Colorado residency requirement to obtain permit to carry concealed handgun), aff'd on other grounds, 707 F.3d 1197 (10th Cir. 2013); Peruta v. County of San Diego, 758 F. Supp. 2d 1106, 1119–20 (S.D. Cal. 2010) (same, as to San Diego County residency requirement to carry concealed firearm)).

Finally, contrary to the defendant's suggestion, the regulatory scheme does not completely prohibit non-residents from possessing firearms while within the District. The District of Columbia does not require registration of firearms for "any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction." D.C. Code § 7-2502.01(b)(3). When in possession of a firearm for recreational purposes, the non-resident must, upon demand of law-enforcement personnel, "exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides." Id. D.C. Code § 7-2502.01(b)(3) also requires that non-residents transporting a weapon from another State store it "in accordance with the provisions outlined in D.C. Code § 22-4504.02." The defendant has not shown that he satisfied these requirements.

## II. NONE OF THE PHYSICAL EVIDENCE OR THE DEFENDANT'S STATEMENTS SHOULD BE SUPPRESSED

In one of his *pro se* motions, the defendant claims he was "searched and seized without a proper complaint," that he was "interrogated for hours without a Miranda warning," and that his property was seized and has not yet been returned [Def. Mot. filed 3/7/14 at ¶¶ 13, 14, 17]. Construing these assertions as raising challenges under the Fourth Amendment, the Court

ordered a substantive response from the government. See Mem. Op. at 15 [Dkt. No. 76]. The defendant's claims are without merit and should be denied.

**A. The Stop of the Defendant Was Reasonable**

The defendant claims he was "searched and seized without a proper complaint" which the Court has construed as a challenge under the Fourth Amendment to the circumstances surrounding this initial contact with police officers. See Mem. Op. at 15 [Dkt. No. 76] (quoting Def. Mot. filed 3/7/14 at ¶ 13). The Fourth Amendment protects against "unreasonable" searches and seizures and the stop of an individual is thus "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren v. United States, 517 U.S. 806, 810 (1996). The police may make a brief investigative detention of a person (or an object, see United States v. Nurse, 916 F.2d 20 (D.C. Cir. 1990)) upon "articulable suspicion." Terry v. Ohio, 392 U.S. 1 (1968).

In evaluating the reasonableness of a particular stop, a court must judge the facts against an objective standard: "'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'" United States v. Hill, 131 F.3d 1056, 1059 (D.C. Cir. 1997) (quoting Terry, 392 U.S. at 21-22) (further internal quotation omitted). Here, the initial stop of the defendant was imminently reasonable. To begin with, prior to the interaction between the Capitol Police officers and the defendant, the officers observed a machete and what appeared to be a gun holster in a car they were able to identify as being registered to the defendant. Therefore, at the time of their initial contact with the defendant, the officers already had evidence that the defendant had committed a violation of 40 U.S.C. § 5104(e)(1), which prohibits the possession of weapons on the grounds of the U.S. Capitol. Once the officers made contact with the defendant and the

defendant confirmed that the Jeep was his and there were weapons inside the vehicle, the officers

had ample cause to believe that the defendant had violated the prohibition on carrying weapons

on the Capitol grounds and therefore to detain him pending further on-scene investigation.

**B.  Defendant's On-Scene Statements Were not the Product of Custodial Interrogation**

Although the defendant does not specify the statements he seeks to suppress, neither his

pre-arrest statements in the parking lot to the Capitol Police officers nor his post-arrest

statements to FBI agents were obtained in violation of the defendant's constitutional rights.

In Miranda v. Arizona, the Supreme Court held that, statements made during "custodial

interrogation" are only admissible if, prior to the defendant's statements, law enforcement

officers advised the accused of his right to remain silent and to have an attorney present during

questioning.  384 U.S. 436, 444, 467-74, 478-79 (1966).  As explained in Miranda, custodial

interrogation refers to "questioning initiated by law enforcement officers after a person has been

taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. at

444.  The Supreme Court has stressed that these safeguards apply only when a defendant is both

in custody and being interrogated.  Rhode Island v. Innis, 446 U.S. 291, 297 (1980); Beckwith v.

United States, 425 U.S. 341, 347 (1975).

Moreover, it is clear that police need to be able to make "some inquiry . . . as part of an

investigation notwithstanding limited and brief restraints by police in their effort to screen crimes

from relatively routine mishaps."  Allen v. United States, 390 F.2d 476, 479 (Miranda warnings

not required before police may ask generic questions necessary to determine facts of situation),

supplemented, 404 F.2d 1335 (D.C. Cir. 1968); see also Reid v. United States, 581 A.2d 359

(D.C. 1990) (statements made in response to investigatory questions in an ambiguous situation

were properly admitted); Smith v. United States, 586 A.2d 684 (D.C. 1991) (instinctive question

to defendant in response to discovering that defendant brought gun into halfway house was not an "interrogation" and did not violate Miranda); Owens v. United States, 340 A.2d 821 (D.C. 1975) (statements admissible where a police officer, while handcuffing a defendant on the roof of a burglarized building, asked him what he was doing on the roof).

Here, the defendant's initial statements on scene acknowledging his identity and ownership of the car were made while the defendant was neither in custody nor being interrogated. Moreover, the officer's questions that prompted those responses from the defendant were just the type of limited inquiry allowed by Allen and its progeny to ascertain the basic facts of a situation.

**C. Defendant Waived His Fifth Amendment Rights During his Post-Arrest Interview**

The defendant claims that his Fifth Amendment rights were violated during his post-arrest interview with FBI agents because they did not inform him of his rights prior to his interrogation [Def. Mot. filed 3/7/14 at ¶ 14]. This claim is belied by the facts and the applicable law.

After receiving the Miranda warnings, a suspect may waive his rights and provide a statement to the police without the presence of counsel. North Carolina v. Butler, 441 U.S. 369, 372-76 (1979). To be valid, the waiver must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) knowing and intelligent in the sense that it was "made with a full awareness both of the right being abandoned and the consequences of the decision to abandon it." Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and

the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Burbine, 475 U.S. at 421.

Both requirements are satisfied here. After his arrest, the defendant was taken to the police station to be processed. There, the defendant was interviewed by FBI agents after he was informed of and then waived his Miranda rights orally and in writing. See Ex. A. The defendant does not contest that he voluntarily waived his rights. Indeed, he was not subject to any physical violence, threats, or intimidating displays during the interview. The defendant made no argument or mention of these factors in his pleadings because there were none to allege. Moreover, the defendant plainly understood how to refuse to waive his rights. While still in the House of Representatives parking and after consenting to be frisked, the defendant initially told the officers they had his consent to search his Jeep. But, after carefully reviewing a form the officers asked the defendant to sign to memorialize his consent and asking the officers to make certain textual changes to the document, the defendant refused to consent to a search of his Jeep. The defendant's challenge to the manner in which his statements were obtained therefore must fail.

**D. The Search of the Defendant's Car Was Performed Pursuant to a Warrant and the Evidence Obtained Thereby Should Not be Suppressed**

The defendant claims he was searched "without a proper complaint" which the Court has construed as a challenge under the Fourth Amendment to the constitutionality of the searches conducted by the police of the defendant's person and his vehicle [Def. Mot. filed 3/7/14 at ¶ 13]. This assertion has no merit.

As an initial matter, prior to being frisked, the defendant could have been placed under arrest, and searched incident to that arrest, for possessing weapons on the Capitol grounds because the officers had identified at least one prohibited weapon in the defendant's vehicle. See

Chimel v. California, 395 U.S. 752, 763 (1969) (after making a valid arrest, police may conduct a full search of the arrestee's person as well as the area under the arrestee's immediate control at the time of arrest). But, even if the officers did not yet have probable cause, the defendant consented to the search of his person, and therefore the frisk was permissible because consensual searches fall outside the Fourth Amendment's warrant requirement. See United States v. Drayton, 536 U.S. 194 (2002) (a search is not unreasonable under the Fourth Amendment if an individual voluntarily consents to the search, even where officers have no reason to suspect an individual has committed a crime); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). There is no evidence of duress or coercion, and nothing alleged by the defendant to demonstrate that this consent was not voluntarily given.

To the extent the defendant now challenges the search of his Jeep, that search was conducted pursuant to a warrant and therefore in compliance with the requirements of the Fourth Amendment. See Ex. C. The defendant has not claimed any deficiencies in the warrant because there are no infirmities to allege.

Respectfully Submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
BAR NO. 447-889

By: _____/s/___________________________
PETER C. LALLAS
Assistant United States Attorney
New York Bar
(202) 252-6879
Peter.Lallas@usdoj.gov